IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| United States of America, | ) | Case No. 8:25cr160 |
| Plaintiff, | ) | |
| | ) | **Sentencing Position** |
| v. | ) | |
| | ) | |
| Gabriel Hurtado Cariaco | ) | |
| Defendant. | ) | |

Gabriel Hurtado Cariaco should receive a sentence of time served.

He should also receive an apology from the Department of Justice and the

Department of Homeland Security.

## Introduction

On June 18, 2025, two masked federal agents pulled Gabriel Hurtado

Cariaco's car over while he was working as a DoorDash driver. As the agents tried to

handcuff Mr. Hurtado Cariaco, the agents used deadly-force chokeholds (plural) and

struck his arms with closed fists. During the struggle, Mr. Hurtado Cariaco wrestled

free from the agents' grasps and ran back to his apartment where he was later

arrested.

In the 36 hours that followed, the Departments of Homeland Security and

Justice propagated increasingly fantastic versions of these events in court filings and

press releases riddled with falsehoods. National and international media outlets

reported and repeated these falsehoods – that Mr. Hurtado Cariaco was in a gang,

that Mr. Hurtado Cariaco was a terrorist, that Mr. Hurtado Cariaco had violently

attacked the agents, that Mr. Hurtado Cariaco had tried to *kill* one of the agents – so many times that they even reached his mother in Venezuela.

But for a father and son in Bellevue, who recorded the encounter and demonstrably debunked the government's initial version(s), Mr. Hurtado Cariaco might have been convicted of attempted murder on the word of federal agents.

### The Week-One Facts

On the day of Gabriel Hurtado Cariaco's arrest, Special Agent Craig Allrich of Homeland Security Investigations (HSI) (who is neither Victim 1 nor Victim 2) swore to and submitted a criminal complaint. In this first sworn complaint, SA Allrich accused Mr. Hurtado Cariaco of forcibly resisting arrest in violation of 18 U.S.C § 111(a)(1). In the attached two-and-one-page affidavit, SA Allrich wrote that Mr. Hurtado Cariaco, among other things, "used his leverage and threw [Victim 1] off him resulting in [Victim 1]'s head to strike the pavement…caus[ing] [Victim 1] to sustain a head injury and lacerations to their upper extremity." Dkt. Entry #1, 8:25mj374.

Someone, however, was dissatisfied with this attempt. And so, the next day, June 19, 2025, SA Allrich drafted an *amended* complaint. Dkt. Entry #4, 8:25mj374. In this version, SA Allrich alleged that Mr. Hurtado Cariaco "violently threw himself against Victim 1, launching Victim 1 into the air and causing Victim 1's head to smack harshly into the ground." *Id.* at 4 (of 6). In the next paragraph, SA Allrich wrote:

> HURTADO-Cariaco was then able to get control of Victim 1 and place Victim 1 into a chokehold. I am familiar in my training and experience as a law enforcement officer that a chokehold in considered deadly force. Victim 2 then began to give commands to in Spanish for HURTADO-Cariaco to release Victim 1. HURTADO-Cariaco continued to keep Victim 1's neck in a choke hold. HURTADO-Cariaco appeared to choose to continue choking Victim 1 rather than simply flee the scene.

*Id.*

On June 20, 2025, the same day that Mr. Hurtado Cariaco was due in court for his initial appearance, the Department of Homeland Security issued a press release. *See* D.E. 101 (filed separately.) In it, a DHS spokesperson said, "This Venezuelan national is a criminal illegal alien and *Tren de Aragua* gang member who violently attacked an ICE and FBI agent and has been charged with attempted murder." *Id.* The press release continued, claiming that "[d]uring the attack, the illegal alien threw the ICE agent to the ground, slammed her head into the pavement, ripped off her body armor, and made repeated and violent physical contact." *Id.*

The Department of Justice also issued a press release on June 20, 2025, quoting (among others) then-Attorney General Pamela Bondi and then-Deputy Attorney General Todd Blanche. *See* D.E. 102. Like the amended complaint, the Department of Justice claimed that Mr. Hurtado Cariaco "maneuvered behind the injured agent and placed that agent into a chokehold," ignoring "commands from the other agent" and "continu[ing] to choke the agent on the ground." *Id.*

A number of media outlets reprinted the content of these press releases. For example, Fox News: Julia Bonavita, "Venezuelan gang suspect in US illegally

allegedly attempts to murder federal agent during arrest," Fox News, June 23, 2025

https://www.foxnews.com/us/venezuelan-gang-suspect-us-illegally-allegedly-attempts-murder-federal-agent-during-arrest (last accessed May 27, 2026). *See* D.E. 103.

On June 24, 2025, United States Magistrate Judge Ryan C. Carson presided over a preliminary hearing, in which the United States, supported by a gallery full of federal agents, called two witnesses: SA Laura McCord of HSI and HSI Tactical Instructor Matthew Johnson. *See, generally,* Transcript of June 24, 2025 Preliminary Hearing, Dkt. Entry # 30; D. E. 104 (hereinafter "D.E. 104.")

During the hearing, Mr. Johnson defined a chokehold as "a technique that is designed to either cut off the blood flow to the brain through restriction of the carotid arteries or obstruction of the trachea which would attack the windpipe." D.E. 104 at 8. Mr. Johnson testified that a "choke hold or any other carotid restraint is classified as a deadly force technique that is only authorized when other deadly force is authorized." *Id.* Such a move could, Mr. Johnson testified, render someone unconscious within seconds and kill them. *Id.* at 9.

Mr. Johnson further testified that he had been told by Victim 2 – an FBI agent – that Mr. Hurtado Cariaco had placed Victim 1 into a chokehold after Mr. Hurtado Cariaco and the two agents had fallen to the ground. *Id.* at 18. Johnson reaffirmed the narrative from the amended complaint, *i.e.,* that Victim 2's use of a deadly-force chokehold was an immediate response to get Mr. Hurtado Cariaco to stop using a chokehold on Victim 1. *Id.* at 20.

Mr. Johnson testified that law enforcement officers are not trained to do chokeholds.

> MCWILLIAMS: And so in your training, both with HSI and in your previous experience, do they train you, law enforcement officers, how to properly apply a choke hold?
>
> JOHNSON: They train us how to escape it.
>
> MCWILLIAMS: Okay. But they don't train you how to do one?
>
> JOHNSON: Correct.
>
> ***
>
> MCWILLIAMS: Is it the policy then of HSI that if someone puts another person into a choke hold, that they are necessarily trying to kill them?
>
> JOHNSON: It means that they are at risk of great bodily injury or death.

D.E. 104 at 18-19.

Mr. Johnson also hypothesized that Mr. Hurtado Cariaco had tried to remove a heavy plate with which to assault Victim 1. D.E. 104 at 9-10. Mr. Johnson testified that, after the incident, a plate from Victim 1's tactical vest had been located on the ground and that he had never heard of one of these plates falling out of a vest. *Ergo*, Johnson testified, Mr. Hurtado Cariaco must've been trying to get the plate out of the vest to use as a blunt object or to render Victim 1 vulnerable to body blows. *Id.*

Special Agent McCord testified that, on June 20, she and another agent (presumably SA Allrich) had transported Mr. Hurtado Cariaco from the Douglas

County Correctional Center to the courthouse and that, during this ride, she had

asked Mr. Hurtado Cariaco a series of questions about his arrest:

> So I specifically asked with the other special agent assigned to this case
> if he had been specifically trained in a choke hold. I motioned with my
> arm and my and my hand what I was asking; a choke hold, you mean –
> meaning, you know, wrapping your arm around the neck of another
> person. Said the term in Spanish multiple times; and the defendant
> said, *yeah, I know exactly what you're talking about*. He said a term in
> Spanish and I said yes, where did you learn that? How did you get
> trained on that? The defendant stated he did not have any training on a
> choke hold. I asked him how he knew how to do it. He said that he
> didn't have any training on it. And so then I asked him then why did
> you put the agent – the special agent in a choke hold? *And he said I just
> did it out of being frightened. I was scared and that's why I did it.*

D.E. 104 at 43 (emphases added). The U.S. Attorney then asked for clarification: "He

didn't deny placing anyone in a choke hold." To which SA McCord testified, "He

didn't deny placing the agent in a choke hold and explained the reason why he had

done it." *Id.*

> At the end of the preliminary hearing, the United States argued:

> I think when a defendant is intentionally strangling another human
> being in a technique that is deadly within seconds and that defendant
> himself is specially trained and has operated in a violent military
> organization for years, that he is well aware of the danger he is putting
> Victim 1 in intentionally. I think by making her even further vulnerable
> by taking away her bulletproof plate from her vest, he was clearly
> intending to do significant harm…It is circumstantial evidence, Your
> Honor, but I think it's strong to intentionally try and strangle the life
> out of Victim 1 when you were trained to do so.

D.E. 104 at 54-55. When Judge Carson asked whether the United States had

established probable cause to believe that Mr. Hurtado Cariaco had intended to kill

Victim 1, the United States argued that Mr. Hurtado Cariaco had Victim 1 in an

"intentional deadly force choke hold" and that he "may have had his own purposes for wanting to *eliminate* her." D.E. 104 at 56 (emphasis added.) "If he just wanted to run or flee, he could have done that when she was already on the ground and he had the advantage, but he chose to place her in a choke hold. And but for Victim 2, he would not have let her go. The only reason the crime [of murder] wasn't completed was because Victim 2 intervened…." *Id.* at 57.

### The Actual Facts

"Lordy, I hope there are tapes."
– Former FBI Director James Comey, June 8, 2017

The Week-One facts – *e.g.,* Special Agent Allrich's complaints, the press releases quoted *ad nauseum* by the media, Special Agent McCord's and Mr. Johnson's testimony – were pushed by the United States *before* they learned that a pair of Good Samaritans (a father and son) had recorded the encounter between the agents and Gabriel Hurtado Cariaco. Those tapes – offered as D.E. 105 and 106 – depict a radically different encounter than that which was sworn to by SA Allrich, told to Mr. Johnson by Victim 2, and delivered to the media by the Departments of Justice and Homeland Security.

Gabriel Hurtado Cariaco presented his asylum claim to the U.S. Citizenship and Immigration Services in June 2023. After an eight-month vetting by the Department of Homeland Security, he was paroled into the United States and his asylum claim docketed before an immigration judge. On the date of his unexpected arrest, his next court date before an immigration judge was set for July 16, 2025.

He had received permission to work from the United States government and gotten a job at Walmart in Colorado. He held a valid driver's license. He and his girlfriend had moved to Bellevue because they were impressed by the inexpensive cost of living. To help pay bills, Mr. Hurtado Cariaco began delivering takeout. Gabriel Hurtado Cariaco was working as a DoorDash delivery driver when he was arrested on June 18, 2025.

Three times in June 2025, Mr. Hurtado Cariaco's car was stopped by uniformed officers for traffic offenses. Each of these encounters – on June 5, June 7, and June 16 – were recorded by body-worn camera. Each time, Mr. Hurtado Cariaco politely tendered his driver's license and waited patiently in his car while the (often-befuddled) officers called the FBI's "terrorist watch list." Every single time, Mr. Hurtado Cariaco was working, delivering food.

Because Mr. Hurtado Cariaco was living and working in the United States with the permission of the United States government, on June 18, 2025, he had no reason to think he was going to be arrested. And so, confronted by two masked, armed, and plain-clothesed federal agents (who were from the same agenc(ies) that had recently arrested and sent 238 Venezuelans to El Salvador), Gabriel Hurtado Cariaco, the same person who had politely sat through three traffic stops with uniformed officers, panicked, resisted arrest, and ran to his home.

The agents were not wearing body-worn cameras on June 18, 2026. Their cars were not outfitted with dashboard cameras. As the dust settled and they began to write reports, they did not the encounter had been recorded. The complaint, the

amended complaint, and the press releases betray the boldness of people who have no reason to think that their credibility would be challenged.

But the encounter *had* been recorded.[1]

The first video, D.E. 105, was filmed from a car parked in a nearby driveway. That video shows both agents placing Mr. Hurtado Cariaco in chokeholds – and *not* the other way around – well before the trio ended upon on the ground (when Victim 2 claimed the chokehold had happened).

---

1 Two people had separately recorded overlapping parts of agents' attempt to arrest Gabriel Hurtado Cariaco The first video, D.E. 105, is 47 seconds long. The second video, D.E. 106, runs one minute and forty-eight second. The videos overlap slightly, with D.E. 106 beginning right at moment D.E. 105 ends.



D.E. 105 at 00:04



D.E. 105 at 00:09.



D.E. 105 at 00:23.

According to the testimony of HSI Instructor Matthew Johnson, these chokeholds constitute the unprovoked use deadly force. Chokeholds are deadly force

– a technique that officers on not trained to do, only to escape -- and placing someone into a chokehold places them "at risk of great bodily injury or death." D.E. 104 at 18-19.

These chokeholds also debunk the entire narrative offered by Victim 2, *i.e.,* that, while on the ground, he thought he saw Mr. Hurtado Cariaco place Victim 1 into a chokehold and that, to prevent harm from coming to Victim 1, he reciprocated by placing Mr. Hurtado Cariaco into a chokehold. Setting aside, of course, the fact that Mr. Hurtado Cariaco did not place *anyone* into a chokehold, it's not enough to say that this was a simple mistake by Victim 2. Why? Because the chokeholds used against Mr. Hurtado Cariaco were used by *both* agents and, more importantly, they were used well before the trio end up on the ground. *See* D.E. 105 at 00:04, 00:09, and 00:23. Had Victim 2 truly (even if mistakenly) believed that, while the three were on the ground, Hurtado Cariaco had placed Victim 1 into a chokehold, his chokehold would have occurred then, not before.

The second video, D.E. 106, picks up right where D.E. 105 leaves off, with Mr. Hurtado Cariaco face down in the yard, Victim 1 holding onto his right arm. Victim 2 has his knee on Mr. Hurtado Cariaco's legs and is holding Mr. Hurtado Cariaco's left arm. This is the part of the encounter in which Victim 2 claims to have seen Mr. Hurtado Cariaco place Victim 1 into a chokehold. After about 28 seconds on the ground, Mr. Hurtado Cariaco tries to stand up. D.E. 106 at 00:28. The agents pull his shirt off. *Id.* at 00:35. Even though, at several points, the agents are vulnerable to being punched or kicked by Mr. Hurtado Cariaco, such as at D.E. 106 at 00:37

(when both agents are on their knees and Mr. Hurtaado Cariaco is standing over them), he does not become violent. Instead, he places his hands on Victim 1's face and pulls his body away from the pair, dragging Victim 2 on his left leg. *Id.* at 00:41. After Victim 1 gives chase, she grabs the back of Mr. Hurtado Cariaco's trousers and loses her footing when he turns to look behind him. If you look closely, you can see the plate from her tactical vest pop out when she falls. D.E. 106 at 00:48. (Victim 2 later picks it up right where Victim 1 fell). *Id.* at 01:27. Watching D.E. 105 and 106, you can see that Mr. Hurtado Cariaco hands are usually being held by the agents and never come anywhere near Victim 1's ballistic vest. The plate is found, not where the trio was on the ground, but where Victim 1 fell.

The videos establish conclusively that Gabriel Hurtado Cariaco did not place anyone into a chokehold. Why then, one might ask, did he *admit* to Special Agent McCord that he had put Victim 1 into a chokehold if he had not, in fact, done so?

Again, Special Agent McCord testified before Judge Carson that, on the June 20 ride from DCCC to court, she had spoken to Mr. Hurtado Cariaco:

> So I specifically asked with the other special agent assigned to this case if he had been specifically trained in a choke hold. I motioned with my arm and my and my hand what I was asking; a choke hold, you mean – meaning, you know, wrapping your arm around the neck of another person. Said the term in Spanish multiple times; and the defendant said, *yeah, I know exactly what you're talking about.* He said a term in Spanish and I said yes, where did you learn that? How did you get trained on that? The defendant stated he did not have any training on a choke hold. I asked him how he knew how to do it. He said that he didn't have any training on it. And so then I asked him then why did you put the agent – the special agent in a choke hold? *And he said I just did it out of being frightened. I was scared and that's why I did it.*

D.E. 104 at 43 (emphases again added). SA McCord clarified: "He didn't deny placing the agent in a choke hold and explained the reason why he had done it." *Id.*

Fortunately, there are (again) tapes. This encounter was audio recorded. D.E. 107. The interview (performed in a car between SAs McCord and Allrich and Mr. Hurtado Cariaco) lasted thirteen-and-a-half minutes. After getting some phone numbers out of his phone, SA Allrich asked (through SA McCord who was interpreting) why Mr. Hurtado Cariaco had run away. D.E. 107 at 6:25. Mr. Hurtado Cariaco told the agents was that he had been scared because the cars were following him, the two officers got out without saying a word, and he had once been kidnapped and robbed by members of a Mexican cartel dressed like police officers. D. E. 107 at 6:33-8:19.[2] He admitted that he should not have run, but that he was scared. *Id.* at 8:19.

When SA Allrich asked, "But you fought, too, right?" Mr. Hurtado Cariaco answered that he hadn't fought and that one of the officers had placed *him* into a chokehold. D.E. 107 at 9:08. He elaborated that the officers were hitting him on his back and that he had resisted this. *Id.* at 9:08-16. The agents asked if he had received any training in hand-to-hand combat in the Venezuelan military and Mr. Hurtado Cariaco replied that he had only received bayonet training. *Id.* at 9:16-

---

2  Mr. Hurtado Cariaco first reported this to U.S. Citizenship and Immigration Services in his credible-fear interview on June 27, 2023. The transcript of the interview, located in his A-file, states that he specifically reported his group being assaulted by "police officers" in Juaganca, Mexico in June 2023 and having their cell phones and money taken. *See* D.E. 118 at 16.

10:24.

SA Allrich then asked, "But why did you go and you grabbed the one, the female agent you grabbed her by her neck and and chokehold." *Id* at 11:27-32. SA McCord translated this question as: "*Pero la, la oficial agente federal que era mujer, ¿por qué la agarraste con tu, con tu brazo, como, a ponerle la cabeza aquí? Como que tú la agarras así con un…eh, enganche?*" which translates to "But, but the federal officer agent who was a woman, why did you grab her with your, with your arm, like, to put her head here? Like you grab her like this with a…um, hook." *Id.* at 11:30-11:46. SA Allrich quickly added, "Where did you learn that?" Mr. Hurtado Cariaco replied, "*No, Officer, ellos tenían mis manos, los dos atrás,*" which means, "No, Officer, they had my hands, both of them, behind my back." *Id.* at 11:44. SA McCord then asked, "*No, cuando tú tenías tus manos libre, tú la agarraste por, por acá, ¿no? En una llave. Sí me entiendes, ¿no?*" which means, "No, when you had your hands free, you grabbed her here, didn't you? In a hold? You do understand me, right?" *Id.* at 11:47-11:53. Mr. Hurtado Cariaco replied, "Yes, yes I do." When SA McCord pressed, "Okay where did you learn that? Is that part of your training or where did you learn that?" Mr. Hurtado Cariaco answered, "No, no not at all. I've never learned anything. Because I was scared, you know?" *Id.* at 11:53-12:00. SA McCord translated this exchange to SA Allrich as follows:

> Okay so I said, "When you had her in this hold, you know what I'm explaining, like around her neck, the female agent, and where did you learn that training? Were you taught that?" And he goes, "No, they had my hands behind my back." And I said, "No, when your hands were free and you had her in a chokehold, where did you learn that?" And he said,

"No, I guess it was just me out of fear, doing it."

*Id.* at 12:09-30.

Not exactly.

He did not say he used a chokehold or "it was just me out of fear, doing it." He simply said, "Because I was scared." From there, there is only talking past each other, an admission to making a "mistake" (the mistake being the "resisting" Mr. Hurtado Cariaco alluded to earlier in the conversation), concluding with an offer by Mr. Hurtado Cariaco to serve in the U.S. military. He certainly did not, as SA McCord later testified, say "yeah I know exactly what you are talking about" and admit to placing Victim 1 in a chokehold (at all).

Defense Exhibits 105 and 106 confirm that, despite the leading questions from SAs Allrich and McCord and the mistranslation of his answers, Gabriel Hurtado Cariaco was telling the truth: the agents put *him* into a chokehold (not the other way around), hit him in the back, and that he resisted and ran away because he was scared.

### How did all of this happen?

Even though HSI agents saw the videos (D.E. 105 and 106) via social media in mid-July, respectively, the United States still sought (and received) an indictment that included a charge of attempted murder. That charge remained pending for four months after the videos were discovered. Once the United States relinquished the attempted-murder charge, it replaced it with an equally fantastic material-support-of-terrorism charge.

In June 2025, Gabriel Hurtado Cariaco had been paroled into the United States for months, while his asylum claim was being adjudicated. He had been granted a work permit and gotten a job at Walmart. He had a valid driver's license. For almost two years, he lived and worked legally in the United States. He'd had several routine interactions with police officers doing traffic enforcement without any problems at all. So how and why, suddenly, on June 18, 2025, did the Department of Homeland Security have a warrant to arrest him? Why did the Department of Homeland Security send two masked agents in plain clothes and unmarked cars to arrest Gabriel Hurtado Cariaco?

Because he's Venezuelan.

On January 20, 2025, an Executive Order was signed designating a Venezuelan prison gang, Tren de Aragua, as a "foreign terrorist organization." This designation was slated to take effect on February 20, 2025. According to PBS, this designation was made on dubious grounds and motivated by foreign policy: "U.S. intelligence agencies have disputed [President Donald] Trump's central claim that Maduro's administration was working with Tren de Aragua and orchestrating drug trafficking and illegal immigration into the U.S." Ben Finley, "A timeline of U.S. military escalation against Venezuela leading to Maduro's capture, PBS, Jan. 3, 2026. https://www.pbs.org/newshour/world/a-timeline-of-u-s-military-escalation-against-venezuela-leading-to-maduros-capture (last accessed May 28, 2026).

Then, on February 3, 2025, then-DHS Secretary Kristi Noem provided notice that the department intended to vacate an extension of temporary protected status

and deferred enforced departure (TPS) for Venezuelans. *See:*

https://www.aila.org/library/uscis-90-fr-8805-2-3-25 (last accessed May 28, 2026).

About this vacatur, the Ninth Circuit later noted that:

> More than 600,000 Venezuelan citizens living in the United States rely on the protections provided by Venezuela's TPS status. The real people affected by the Secretary's actions are spouses and parent of U.S. citizens, neighbors in our communities, and contributing members of society who have lower rates of criminality and higher rates of college educations and workforce participation than the general population.

*Nat'l TPS Alliance v. Noem,* 163 F.4th 1152, 1156 (9th Cir. 2025) (internal quotation omitted)).

The United States government disagrees.

In March 2025, the Executive Branch used the 1798 Alien Enemies Act to arrest and remove 238 Venezuelans to El Salvador's notorious *Centro de Confinamiento del Terrorismo* (or CECOT). *See:* Syra Ortiz Blanes, Veronica Egui Brito, and Claire Healy, "Trump sent these Venezuelans to El Salvador mega prison. Their families deny gang ties." Miami Herald, March 18, 2025, miamiherald.com/news/local/immigration/article302251339.html, D.E. 108; *see also* Didi Martinez, Daniella Silva, and Carmen Sesin, "Families of deported Venezuelans are distraught their loved ones were sent to El Salvador," NBC News, March 19, 2025, nbcnews.com/news/amp/rcna196950, D.E. 109; and Jazmine Ulloa and Zolan Kanno-Youngs, "Trump Officials Say Deportees Were Gang Members. Few Details Were Disclosed, New York Times, March 18, 2025, www.nytimes.com/2025/03/18/us/trump-deportations-venezuela-gang.html, D.E. 110.

White House Press Secretary Karoline Leavitt called the removed Venezuelans "heinous monsters." Statement from the Press Secretary, March 16, 2025, https://www.whitehouse.gov/briefings-statements/2025/03/statement-from-the-press-secretary-50c7/ (last accessed May 29, 2026), D.E. 111. Many of these people, it would later turn out, were arrested based on plainly incorrect assumptions that they were affiliated with Tren de Aragua.

The Department of Homeland Security created an Alien Enemy Validation Guide for Tren de Aragua. *See J.G.G. v. Trump,* Case No. 1:25cv766-JEB, Dist. D.C., Dkt. Entry # 67-21; D.E. 112. This "Guide" creates a points-based system for Venezuelans, who were over the age of fourteen. *Id.* Eight points or more meant the person was a member of Tren de Aragua. *Id.* Six or seven-pointers required supervisor consultation. *Id.* Tattoos count for four points. *Id.* Hand signs count for two points. Attire with "insignia, logos, notations, drawings, or dress known to indicate allegiance to TDA" was worth four points. *Id.* Being with (in person or in a picture) with a member of TdA3 was worth two points apiece. *Id.*

So it didn't take much.

Latin American scholars and civil-rights groups universally denounced these arrests. In attachments submitted in support of a class-action complaint and petition for writ of habeas corpus in the CECOT cases, several scholars weighed in on the

---

3 "Member of TdA" being defined as someone DHS thinks is a member of TdA, *i.e.,* "known."

government's system of myths and assumptions. *See, generally, J.G.G. v. Trump,*
Case No. 1:25cv766-JEB (Dist. D.C.).

Dr. Rebecca Hanson, who holds a PhD is Sociology (dissertation title, "Civilian Policing, Sociality Revolution, and Violent Pluralism in Venezuela") and is an Assistant Professor of Sociology and Criminology at the University of Florida wrote in a March 2025 declaration:

> 22. Tattoos are not a reliable way to identify members of the group. The TdA, and gangs more generally in Venezuela, do not have a history of using tattoos to indicate membership. Indeed, no credible scholarship or studies of gangs in Venezuela indicate tattooing as a shared common practice among gang members. TdA members may, of course, have tattoos, but this is not part of a collective identity. In fact, many young Venezuelans who have no association with the TdA individually opt for personal tattoos based on personally meaningful symbols or popular culture iconography. The government's reliance on tattoos appears to result from an incorrect conflation of gang practices in Central America and Venezuela. In countries like El Salvador and Honduras, gangs have long used tattoos to indicate membership and identity.

> 23. Hand gestures are also not a credible way to identify the TdA. There are no formal hand gestures associated with the group. Overall, I am aware of no iconography or unifying cultural motifs, such as symbols, insignias, logos, notations, graffiti tags, music, or drawings associated with it. Nor does the gang have a typical manner of dress. Other gangs in Central and South America might have certain hand gestures, symbols, or dress associated with them, but not the TdA.

> 24. I have reviewed law enforcement bulletins provided to me through a Freedom of Information Act request by the nonprofit Property of the People. These documents indicate various tattoos that law enforcement agencies believe to be associated with TdA. Far from being indicative of TdA members, the tattoos identified were merely representative of the cultural milieu of poor and working-class neighborhoods in Venezuela….. The bulletin from the Chicago Homeland Security Investigations Office also said that wearing a Chicago Bulls basketball jersey, especially a Michael Jordan jersey, was an identifier of TdA. But NBA basketball—and Michael Jordan in particular—are very popular

in Venezuelan culture. Venezuelans also take great pride when their fellow Venezuelans are on U.S. professional sports teams, especially baseball and basketball teams. Using sports attire from U.S. professional sports teams with Venezuelan nationals on them to identify TdA membership is simply not credible.

J.G.G. v. Trump, Case No. 1:25cv766, at Doc. 67-3; D.E. 113.

Similarly, Andres Antillano, an Assistant Professor and Head of the Criminology Department at Central University of Venezuela, wrote that he has "conducted over 100 interviews with gang members in Venezuela, with key informants on gang dynamics, and with members within the Maduro regime, as well as ethnographic work in prisons and gang-controlled areas both in Venezuela and neighboring countries." *Id.* at Doc. 67-4; D.E. 114. Professor Antillano concluded that:

> Tren de Aragua has never had defined membership, nor initiation rites or identity marks such as tattoos that identify its members....Tattoos are popular among young Venezuelans and have no connection to belonging to a specific criminal organization or subculture. There is no graphic symbol that identifies Tren de Aragua members.

*Id.*

Stephen Dudley, the co-director of a crime-focused think tank operating out of American University in Washington, D.C. and Medellin, Colombia, agrees: "Tren de Aragua does not have any such tattoos. What's more, even gangs that once used tattoos to identify themselves have moved away from them precisely because they help law enforcement identify them. Therefore, using tattoos as a reliable means of identifying Tren de Aragua members does not seem to me to be a reliable means of identifying them." *Id.* at 67-12; D.E. 115.

Nonetheless, this is, of course, exactly the sort of information that DHS used to get an I-200 warrant to arrest Gabriel Hurtado Cariaco on June 18, 2025.

At his preliminary hearing, Special Agent McCord testified that Mr. Hurtado Cariaco was first marked as "member" of TdA because he was in Guatemala with "males wearing attire that is consistent with TdA members as well as had tattoos that are consistent with TdA tattoos." D.E. 104 at 38-39. Through the government's questioning, SA McCord specifically repeated the checklist myths – debunked as early as March 2025 – that Chicago Bulls attire has a "documented TdA connection" and that certain tattoos are "connected to TdA members." *Id.*

In a later-filed application for a search warrant to this Court, SA McCord repeated these myths:

> 11. HURTADO-CARIACO was encountered by a Guatemalan tactical immigration unit operating in cooperation with Customs and Border Patrol on the border of Guatemala and Honduras on May 13, 2023. During that encounter, officers and investigators observed that HURTADO CARIACO was traveling in a group of approximately fifteen males traveling up from Venezuela (one from Ecuador) who indicated they were bound for the United States. The tactical unit officers took note that all fifteen of the men were wearing clothing and bearing tattoos associated with the Venezuelan gang, [Tren de Aragua]. None of the fifteen men had documentation on them. HURTADO-CARIACO made attempts to deny gang affiliation, but tactical unit officers also observed that HURTADO-CARIACO's demeanor changed significantly when he was questioned about his tattoo, which included designs associated with TDA.

> 12. HURTADO-CARIACO appeared very nervous during the exchange. TDA members are known for being secretive about their tattoos and attempting not to highlight their gang affiliation as openly in tattoos as some other gangs. Prior to that line of questioning, HURTADO-CARIACO was calm and confident. Of further note is HURTADO-CARIACO's tattoo appears to have been inked in 2018, the same year in

which HURTADO-CARIACO, according to his own statements, went absent without leave from the Venezuelan military's Presidential Guard. Your Affiant is aware from my training and experience that TDA members often place a date into their gang affiliated tattoo that is consistent with the date they joined the gang. Your Affiant is aware that 2018 is the year that HURTADO-CARIACO left the Venezuelan military, according to his own statements.

*See* 8:25mj413-MDN at 5-6 (of 44); *see also* 8:25mj374.

It is true that Mr. Hurtado Cariaco left the military in 2018. But April 30, 2018 – the actual date on the tattoo – is the date that Mr. Hurtado Cariaco's son was born. *See* RPSR at ¶ 62, 63, 65; *see also* D.E. 118 at 3, 14. Full stop.

Here's the tattoo:



Right above his son's birthdate is a man and a little boy, *i.e.,* a father and a son. It would be weird to put a little kid and his dad on a gang tattoo. But if you Google "father son tattoos clock," you get a bunch of them:



They're on Pinterest, too:





DHS has, to be sure, made this mistake before.

Among the 238 removed Venezuelans, one was a 26-year-old Venezuelan barber named Franco Caraballo. Mr Caraballo and his wife were seeking asylum. Mr. Caraballo had no record in the United States or Venezuela. How did he get swept up in the removals? He had a tattoo of a clock on his forearm. *See* Tim Padgett, "Was a Venezuelan deported as a terrorist because of a tattoo celebrating his child?" WLRN Public Media, March 19, 2025, D.E. 116. "It was a clock

celebrating the birth of his daughter," his attorney told the media. *Id.* according the article, "One advice many immigration attorneys now give clients who have the popular clock tattoos marking birth times, for example, is to have a birth certificate with that time on hand, to confirm to authorities that the tattoo commemorates a child, not a gang." *Id.*

Even the Department of Homeland Security doesn't believe this stuff.

An internal Customs and Border Patrol memo written in 2023 questioned this pseudoscience: "Gang Unit collections determined that the Chicago Bulls attire, clocks, and rose tattoos are typically related to the Venezuelan culture and not a definite (indicator) of being a member of the (TdA)," reads a "Situational Awareness" bulletin written by the CBP's El Paso Sector Intelligence Unit. *See also* Will Carless and Rick Jervis, "FBI and DHS question using tattoos to accurately ID Venezuelan criminal gangs: exclusive." USA Today, March 28, 2025, D.E. 117. (Note: El Paso Sector is where Mr. Hurtado Cariaco had his credible fear interview.) "In another DHS document, titled 'ICE Intel Leads,' a former Venezuelan police official interviewed by authorities said tattoos are 'the easiest but least effective way' of identifying members of the criminal gang." *Id.* "Unlike other Latin American gang, Tren de Aragua doesn't require its members to get tattoos, Ronna Risquez, a Venezuelan journalist who wrote a book about the gang, told the Associated Press." *Id.*

The Department of Homeland Security has also weaponized Mr. Hurtado Cariaco's military service in Venezuela. SAs McCord and Allrich, in support of

search-warrant affidavits, characterized Mr. Hurtado Cariaco's military service to

this Court thusly:

> 13. During the encounter with the [Guatemalan] tactical unit, HURTADO CARIACO was questioned regarding his military training and background. HURTADO CARIACO stated that he attended a basic Army Training for fourteen months in Venezuela and was trained in these weapons: AK-103, Barretta F92, Broli 9mm and a 50-caliber machine. HURTADO CARIACO then was assigned after basic training to a Special Unit to serve as "Presidential Guard" in Venezuela. Homeland Security Investigations informally consulted with an expert in the Venezuelan military in preparation of this affidavit and provided HURTADO-CARIACO's background in the Venezuelan military to the consultant. This expert assessed that presidential guards in the same position as HURTADO CARIACO occupied in the Venezuelan military are "trained killers," and that those job positions in the Venezuelan military serve separately as agents for the Venezuelan Secret Intelligence.
>
> 14. A separate professional was informally consulted for this search warrant's purposes, and this professional indicated that "Presidential Guards" in Latin American countries, including Venezuela, receive presidential level protection, martial arts style training, and are highly trained and dangerous military positions. This consultant further indicated that a specific Venezuelan commander that HURTADO CARIACO served under was the Director General of Venezuela's Boliviarian National Intelligence Services (SEBIN). According to the aforementioned expert, SEBIN operators who are also presidential guards often kill people as part of their normal duties. The expert assessed that HURTADO CARIACO has likely killed several people given his job titles with the Venezuelan military, his length of service there, and the specific commanders he served under as well (all information which HURTADO CARIACO provided himself to the tactical unit in Guatemala when encountered in 2023).

*See* 8:25mj413-MDN, Dkt. Entry # 1; *see also* 8:25mj374. That is, in sworn filings to

this Court, the Department of Homeland Security cited an *informal* consultation

with an *unnamed* consultant, who has (apparently) opined that everyone in a certain

Venezuelan military unit are "trained killers."[4] An also-*informally*-consulted "separate professional," however, happily goes a step further, hazarding a guess that Mr. Hurtado-Cariaco. instead of being a member of the military, was a member of the SEBIN (which makes little organizational sense) and has "likely killed several people." *Several*. And in doing so, yet again, representatives of the United States have baselessly Gabriel Hurtado Cariaco of committing the gravest sins – murder and attempted murder – without a shred of evidence.

In these un-American paragraphs, SAs McCord and Allrich refer to one or both unnamed people as an "expert" without providing their names, their training, their credentials, their publications – anything that would validate these opinions about a man they never met after an "informal" consultation. And yet they ignore actual experts – among them, scholars, CBP units, Venezuelan police officials – who are willing to attach their name to their conclusions and who have publicly stated their positions for discussion and scrutiny.

Gabriel Hurtado Cariaco deserted the Venezuelan military in opposition to President Maduro's oppression of his countrymen. On June 27, 2023, he presented a claim for asylum and, in doing so, he told U.S. Citizenship and Immigration Services that he deserted "[b]ecause I was not for the government. If you are in the military you have to be with the government and have no freedom of speech." D.E. 118 at 19. He noted that he was afraid of being tortured by the Venezuelan government, which

---

4 To be sure, most militaries, the United States's included, train its members to kill people.

he described as "corrupt." *Id.* at 21. "All money goes to their pocket and people go hungry. They work hard and the military gets very little and they send out to the streets to block marches where people are hungry. The military forces you to support the government and I do not." D.E. 118 at 21.

Such statements of conscientious objection against a repressive regime and in favor of freedom would, in ordinary times, be celebrated in this country. *See, e.g.,* Emma Lazarus, *The New Colossus* (1883). But nowadays an anonymous consultant can look at you, call you a murderer, and that's good enough for the United States.

### Conclusion

The guideline range for resisting arrest when you have no record is 12 to 18 months. Regrettably, Mr. Hurtado Cariaco has been in jail for 13. No one knows what will happen to Gabriel next.

He should obviously receive a sentence of time served.

But, beyond that, there ought to be some kind of reckoning for what happened to him in the minutes, hours, and days after his arrest and for what continues to happen to him. Before he could even appear before a judge, he was called him a "criminal illegal alien," a member of a prison gang, a terrorist, and violent killer. That message – pushed by the most powerful government on earth – traveled halfway around the world while the videos were putting their pants on.

A time-served sentence and then delivery to ICE isn't real justice. The Department of Homeland Security and the Department of Justice ought to look

Gabriel Hurtado Cariaco in the eye and apologize to him for the falsehoods that they spread about him.

I keep asking myself, "What would have happened to Gabriel Hurtado Cariaco without those videos?" The honest answer will give you – as it has given me – a lot of sleepless nights.

By:    /s/ Richard H. McWilliams
**Federal Public Defender**
1620 Dodge Street, Ste. 600
Omaha, NE 68102
(402) 221-7896
Rich_mcwilliams@fd.org